**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

RECEIVED

2019 JUL -2  A 11: 46

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| ALAN SEALS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. STEVEN LEATH in his individual | ) | Case No. 3:19-CV-468 |
| capacity, his official capacity as | ) | |
| President of Auburn University, and his | ) | |
| representative capacity of Auburn | ) | JURY TRIAL DEMANDED |
| University; DR. WILLIAM "BILL" | ) | |
| HARDGRAVE, in his individual | ) | |
| capacity and official capacity as Provost | ) | |
| of Auburn University; DR. TIMOTHY | ) | |
| R. BOOSINGER, in his individual | ) | |
| capacity and official capacity as then | ) | |
| Provost and Vice President for | ) | |
| Academic Affairs at Auburn University; | ) | |
| and DR. JOSEPH AISTRUP, in his | ) | |
| individual capacity and official capacity | ) | |
| as Dean of the College of Liberal Arts, | ) | |
| of Auburn University; DR. | ) | |
| HYEONGWOO KIM, in his individual | ) | |
| capacity and official capacity as interim | ) | |
| head of the Department of Economics, | ) | |
| of Auburn University, | ) | |
| | ) | |
| Defendants. | | |

## **COMPLAINT**

**COMES NOW** the Plaintiff, ALAN SEALS, by and through his attorneys of

record, and files this Complaint against Defendants Dr. Steven Leath, in his

1

individual capacity, his official capacity as (then) President of Auburn University, and his (then) representative capacity of Auburn University; Dr. William "Bill" Hardgrave, in his individual capacity and official capacity as Provost of Auburn University; Dr. Timothy R. Boosinger, in his individual  capacity and official capacity as (then) Provost and Vice President for Academic Affairs of Auburn University; Dr. Joseph Aistrup, in his individual capacity and official capacity as Dean of the College of Liberal Arts, of Auburn University; and Dr. Hyeongwoo Kim, in his individual capacity and official capacity as Interim Head of the Department of Economics, of Auburn University, and states as follows:

## **NATURE OF THE CASE**

1.     This is an action for legal and equitable relief to redress Defendants' violations of Plaintiff's constitutional rights. The suit is brought to secure the protection of and to redress the deprivation of rights secured under the First and Fourteenth Amendments of the United States Constitution, 42 U.S.C. §§ 1983 and 1985, the Alabama State Whistleblower Act, Ala. Code § 36-25-24, and certain torts recognized by the State of Alabama. This lawsuit is brought by the Plaintiff Alan Seals who has been affected by the actions of Defendants as alleged in the claims set forth below, seeking permanent relief from unlawful retaliatory practices that violated plaintiff's civil and constitutional rights. The practices committed by Defendants violate Plaintiff's rights under the First Amendment to the Constitution

of the United States, via 42 U.S.C. § 1983 ("§ 1983") and § 1985 ("§ 1985"), and the law of the State of Alabama.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this cause of action pursuant to 42 U.S.C. §2000e, *et seq*. Jurisdiction over Plaintiff's claims based on Alabama law exist under the doctrine of supplemental jurisdiction, 28 U.S.C. §1367

3.     Plaintiff has fulfilled all conditions precedent to the institution of this action.

4.     Defendants Steven Leath, William Hardgrave, Timothy Boosinger, Joseph Airstrip, and Hyeongwoo Kim are, or were, employed by Auburn University in senior administrative positions and are, on information and belief, located in this judicial district and division.

## PARTIES

5.     Plaintiff, Alan Seals ("Plaintiff," or "Seals"), is a forty year-old white male resident of Auburn, Lee County, Alabama. At all times material herein, he was employed by Auburn University as an associate professor of economics and, until May 25, 2018, was the Economics Department's Graduate Program Officer.

6.     Defendant Dr. Steven Leath is, at all times material herein, the President of Auburn University (at all times material herein, the employer of

3

Plaintiff). Leath served as President of Auburn University until his forced resignation on June 21, 2019.

7.    Defendant Dr. William Hardgrave is, at all times material herein, the Provost of Auburn University.

8.    Defendant Dr. Timothy R. Boosinger was, at all times material herein, the Provost and Vice President for Academic Affairs of Auburn University.

9.    Defendant Dr. Joseph Aistrup is, at all times material herein, the Dean of the Auburn University College of Liberal Arts.

10.    Defendant Hyeongwoo Kim became "Interim Head" of the Department of Economics on or about June 4, 2018.

## STATEMENT OF FACTS

11.    **February 4, 2014.** Auburn University's Faculty Athletics Representative ("FAR"), Dr. Mary Boudreaux, put on a presentation in the University Senate wherein she claimed that there was no clustering of athletes by any major at Auburn. Michael Stern, chair of economics, questioned her in relation to the Public Administration (PUBA) program and football, given the contrasting information Stern was told by a colleague. (During the 2013 Iron Bowl, Dr. Randy Beard (Economics professor and Plaintiff's colleague) noticed that almost all of the star players on the football team had Public Administration as a major).

12.    **December 5, 2014.** John Urschel of the Baltimore Ravens

4

independently discovered the large cluster of football players in PUBA at Auburn and wrote about it in his "Math Meets Football" blog. Mr. Urschel calculated the odds that the amazingly high density of football players in the PUBA major could have occurred randomly at roughly 1 in 3,000,000,000,000,000,000,000,000,000,000,000,000 (1 in three undecillion).

13. **April 30, 2015.** A wide array of documents, data, and emails were requested through FOIA in relation to the closure of the PUBA program and presence of athletes in the program.

14. **July 2, 2015.** Auburn responded to the FOIA request in relation to the closure of the PUBA program.

15. **Mid-July through early-August 2015.** Ben Cohen of the Wall Street Journal produced a story based, in large measure, on the FOIA documents. Plaintiff and Stern assisted Cohen with his request for information for his story.

16. **August 24, 2015.** Aistrup requested a meeting with the Economics Department to propose hiring an external Department head to replace Stern and said Tim Boosinger would pay for it. A lot of hostility surfaced during the meeting, and Aistrup was generally unable to articulate why the faculty should support his proposal.

17. **August 27, 2015.** The Wall Street Journal published "At Auburn: Athletics and Academics Collide" as the lead article of their sports section. The

5

article presented the disturbing outline of the Athletics Department's direct interference in the process to close the Public Administration major, including the explicit offer of Athletics Department money to fund the troubled academic program and pay professors' salaries. The article reveals how athletics officials at Auburn University offered (in writing) to pay to keep the Public Administration major open. However, athletics wanted the source of the funds to remain a secret. The corrupting influence of athletics on the governance of academic curricula at Auburn University, a state university, is a matter of major public concern.

18. **November 1st, 2015.** John Sophocleus published "All the Speaker's Men and the Collapse of AU Athletics" in the Alabama Gazette with further details of the scandal covered by the Wall Street Journal. Sophocleus cites Plaintiff and Stern as sources for his story.

19. **Winter of 2015-2016.** In protest, Plaintiff created a collage of photographs on his door, including a picture of then Provost Timothy Boosinger next to a picture of Joseph Stalin and a photo of Dean Aistrup arm-in-arm with Athletic Director Jay Jacobs which first appeared on the Dean's twitter account. Bill Hardgrave, current Auburn University Provost, and the VP of Facilities, Dan King, were also on the door.

20. **October 18th, 2016.** Dean Aistrup sent an email to Plaintiff with a picture of Plaintiff's office door attached and asked Plaintiff to remove the picture

6

of him and the athletic director from his door. In the email, the Dean invited Plaintiff to his office to take a better picture of him for the door in an effort to intimidate the Plaintiff.

21.    **October 24, 2016.** Dean Aistrup met with the Economics Department to discuss some new academic programs. Prior to the meeting, Aistrup approached Plaintiff with a headshot/photograph of himself and said, "Would you like me to autograph this one for you? To my new BFF, Alan, may the wings of corruption carry you far." Plaintiff was stunned and immediately looked at John Sophocleus, who was sitting right beside him to confirm what Plaintiff had heard. Sophocleus, also appeared stunned, and when plaintiff asked "did I hear that correctly?", Sophocleus repeated back what the dean had said. During the meeting, Dean Aistrup became very angry, red-faced, and began yelling when Plaintiff challenged Aistrup's highly questionable curricular proposals. Dr. Stern had to intervene.

22.    **January 11, 2017.** Michael Stern met with President Gogue. Gogue said that he wanted the Economics Department out of CLA and wanted Chair of Economics to report directly to the Provost's Office. Gogue said it would be a good thing because he would make sure the Department had its revenue under the new budget model (the Department was millions in surplus) and it could simply move its curriculum to the University College.

23.    **January 12, 2017.** Michael Stern, at the behest of President Gogue

7

and Emmett Winn, drafted a proposal and submitted it to the economics faculty for a vote and to the academic program review (APR) committee for review (the APR committee reviews the transfer of curricula between academic units). Plaintiff was a member of the APR committee and is currently chair of APR.

24.     **January 17, 2017 to February 1, 2017.** Plaintiff presented Stern's draft proposal for the independent school to the Academic Program Review Committee. The proposal had been revised with the help of Gogue and Winn and unanimously approved by the faculty of the Economics Department. The budget estimates for the Department as an independent budget entity were approximately two million dollars in surplus. Winn informed the chair of the APR committee (Tillson) that the Provost's Office and the President's Office supported the proposal.

25.     **April 11, 2017.** All of the Department's financial and personnel approval queues in the computer systems were removed from the CLA and transferred directly to the Provost's Office. This effectively made the Department operationally independent from CLA.

26.     **June 19, 2017.** Dr. Steven Leath officially became President of Auburn University.

27.     **July 5, 2017.** Tim Boosinger, Provost, issued a memorandum to Dean Aistrup, openly copying Steven Leath, outlining the involuntary transfer of Plaintiff

8

and the rest of his department back to the College of Liberal Arts and the elimination of their new budget. The agreements regarding the Department of Economics were made directly between Dr. Michael Stern, as chair, and the Office of the President. There is no way Dr. Boosinger could accomplish the retaliatory acts outlined in his memo without direct conspiracy between himself and Dr. Leath.

28.    **July 20, 2017.** The Department's financial and personnel approval queues were returned to CLA. This placed Dean Aistrup in a position to engage in further retaliation against Plaintiff and his Department.

29.    **September 2017** – Provost Boosinger announced his retirement, effective at the end of 2017.

30.    **November 2017.** Defendant Bill Hardgrave was named his replacement as Provost, beginning January 2018.

31.    **November 28, 2017.** Michael Stern contacted Jack Stripling, a senior reporter for the Chronicle of Higher Education.

32.    **December, 2017.** Plaintiff communicated with Jack Stripling many times, along with Stern, to develop an article that would become the front cover story for the national print edition of the Chronicle of Higher Education.

33.    **February 16, 2018.** The Chronicle published online the article titled, "Unrivaled Power: Inside Auburn's secret effort to advance an athlete-friendly curriculum." The article was then published on the front cover of their national print

edition the following week. The article exposed numerous shocking details left out of the Wall Street Journal article related to the efforts to keep the troubled public administration major open to benefit athletics. It also exposed the serious racial issues surrounding the scandal and a broader curricular conspiracy between the provost and athletics officials to create weak academic programs for the benefit of athletes. The Article also mentioned Plaintiff's protest collage on his office door. Finally, the article outlined the repeated acts of retaliation by the administration.

34.   **February 17, 2018.** Jack Stripling tweeted the picture of Plaintiff's office door, sent by Dean Aistrup in an earlier email to Plaintiff.

35.   **March 7, 2018.** One of the Economics Department's young faculty members took a job at another university. This, combined with two retirements and the lack of tenure-track hiring, left the Department with only twelve tenure-track faculty members for the Fall, a number insufficient to properly continue the PhD program.

36.   **March 14, 2018.** The Economics Department voted on the emeritus applications of Professors Rajan Natarajan and Henry Thompson. Dr. Natarajan's emeritus application was approved by the Department and in May approved by College of Liberal Arts, but was subsequently held up by Provost Hardgrave in violation of university policy and procedure.

37.   **March 22, 2018.** Plaintiff, who was the Economics Department's

Director of Graduate Studies, communicated his displeasure with President Leath via email. Leath responded:

Dr. Seals,

I am surprised that a faculty member here would write to condemn the President and have major misunderstandings of reality in the correspondence. Perhaps you should come visit with me and the Provost to learn what is actually happening here with regard to Economics.

Steven Leath

Plaintiff accepted the President's invitation for a meeting, which based upon Leath's specific statements clearly did not include Dean Aistrup.

38. **March 26-Apri 22, 2018.** When the President did not follow up with a meeting time. Michael Stern proposed a broader meeting also involving himself and the Chair of the University Senate, Dr. Dan Svyantek, instead of the new Provost, Dr. Hardgrave (who had consistently avoided communicating with Stern). President Leath accepted and appeared to include his chief of staff, Miles Lackey. Leath's secretary set the day and time for the meeting, but Leath ultimately cancelled the meeting and directed Plaintiff to first meet with Dean Aistrup.

39. **Spring 2018.** Dr. Leath refused to meet with Plaintiff, once again failed to execute an independent budget for Economics, and openly stated that Department of Economics was in CLA in an email.

40. **May 25, 2018.** Approximately thirty minutes after appearing in person

11

to fire Michael Stern as department chair, Aistrup sent an email to Plaintiff stating that he was relieved of his duties, effective immediately. No basis or cause was stated for Plaintiff's removal. Plaintiff was literally in the middle of administering a qualifying exam, in his role as Graduate Program Officer, for PhD students when he received the email. Plaintiff asked Professor Randy Beard to take possession of the students' exams and Plaintiff informed students that he was no longer Graduate Program Officer. The Department website was altered on the same day to reflect the administrative changes made by the Dean. Aistrup did not inform Department faculty, graduate students, or departmental employees of his actions before or immediately afterward and he would not do so for another five days. Plaintiff forwarded Aistrup's email to Leath, Hardgrave, and the general counsel, Jaime Hammer.

41.  **May 30, 2018.** Aistrup finally emailed the Department to inform them of what he had done five days previously. Removing the chair of an academic department without first consulting the faculty is a violation of university policy.

42.  **May 31, 2018.** Plaintiff sent an email to Leath and Hammer highlighting the reckless nature of their conduct.

43.  **June 4, 2018.** In violation of university policy and Economics Department bylaws, Defendant Aistrup named Professor Hyeongwoo Kim as "interim head" of the Department and advised that Professor Kim would appoint a

12

new Graduate Program Officer. Dr. Randy Beard, the Economics Department's most senior professor, wrote a letter to the Chair (Svyantek) and Chair-elect (Baginski) of the University Senate condemning the actions of the administration against Plaintiff and Dr. Stern.

44. **July 3rd, 2018.** "Interim Head" Kim announced that Professors Chris Vickers and Aditi Sengupta would become co-Graduate Program Officers.

45. **August 24th, 2018.** Plaintiff emailed Provost Hardgrave in an effort to resolve the issue before filing a formal grievance against Dean Aistrup and the Provost. The Provost's secretary emailed Plaintiff back four days later with meeting dates in October and Plaintiff accepted an October 1, 2018 meeting.

46. **August 28th, 2018.** Plaintiff emailed the Provost again with the following message:

Provost Hardgrave,

I have agreed to an Oct 1st meeting through your secretary. However, I am going ahead and filing my grievance against you and the CLA Dean on Friday. You have been aware of my situation since late May and to put off speaking to me for me another month only shows me that you place a very low priority on making things right. But I will still hear you out on October 1st.

I will also give you the opportunity to reach out to me (a phone call) before Friday and change this outcome. My cell #######.

47. **August 31st, 2018.** Plaintiff filed a grievance against Dean Aistrup

13

and Provost Hardgrave for the retaliatory dismissal as Graduate Program Officer.

48.   **Fall 2018.** Provost Hardgrave approved a 9% pay raise for Defendant Kim while approving a 3% raise for most of the rest of the Department, except Michael Stern who received 0%. According to university raise guidelines, the 9% and 0% raises for Kim and Stern, respectively, required special approval by Defendant Hardgrave.

49.   **October 1st, 2018.** Plaintiff met alone with Provost Hardgrave. During the meeting, the Provost repeatedly claimed that Plaintiff's dismissal was Dean Aistrup's decision alone and that he "does not get involved at that [departmental] level". Plaintiff asked the Provost for relief, as there was no cause to remove plaintiff from the Graduate Program Officer position. The Provost offered no resolution and told Plaintiff, "You will just have to speak with the Dean." Plaintiff responded by informing the Provost that President Gogue had removed Plaintiff and the rest of his Department from Defendant Aistrup's college partially due to the Aistrup's previous misconduct and retaliatory acts. Plaintiff then asked the Provost if he thought it was appropriate that Aistrup took action against Plaintiff during the administration of an exam (without any stated cause) in his capacity as Graduate Program Officer. The Provost responded that the timing was bad.

50.   **October 5th, 2018.** Muralikrishnan Dhanasekaran, chair of university grievance committee, informed Plaintiff his committee voted not to proceed with

14

grievance.

51.   **April, 2019.**  Plaintiff received a 2018 calendar year performance evaluation from Kim.  The evaluation directly mentioned Plaintiff's service as Graduate Program Officer until May 2018 and rates service performance as "Exceeds Expectations".  No negative comments concerning service Graduate Program Officer are mentioned.

52.   **April 24th, 2019.**  Plaintiff found out an Economics Department graduate program committee was formed by Kim in the Summer of 2018.  Plaintiff, Michael Stern, Liliana Stern, and Randy Beard were the only professors not asked to participate.

53.   **May 2019.**  No summer payroll was entered for Summer of 2019.  The $20,000 Plaintiff would have received, had Plaintiff not been removed in retaliation for comments on public concern, were not made to Plaintiff in violation of Plaintiff's contract.

54.   **May 8, 2019.**  After refusing to assist Defendant Kim in potential acts of illegal retaliation, and after becoming aware of Kim's retaliatory conduct towards the Plaintiff and Michael Stern, Economics Department admin Jennifer Bruno was formally reprimanded.

55.   **May 16, 2019.** Jennifer Bruno received a signed letter from Defendant Aistrup informing her she will be (involuntarily) transferred out of the Department

15

of Economics to the Exploratory Advising Center.

## ACTS BY DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES:

### Dr. Leath

56.   At a minimum, Dr. Steven Leath showed a "deliberate indifference" (if not outright involvement in the conspiracy to injure) in retaliation for the WSJ article, The Chronicle article, the Alabama Gazette article and protected speech on Plaintiff's office door.

57.   Steven Leath is openly copied on the July 5, 2017 Memo involuntarily transferring Plaintiff back to CLA. There is no way Boosinger could accomplish this without the acquiescence of Leath.

58.   An independent school of economics, with approximately two million additional dollars in budget would greatly enhance Plaintiff's career as a professor and/or an administrator.

59.   **Spring 2018**: Leath refused to meet with Plaintiff, failed to execute an independent budget for economics, and openly stated that Plaintiff was in CLA in an email.

### Dr. Hardgrave

60.   At a minimum, Dr. Bill Hardgrave showed a "deliberate indifference" (if not outright involvement in the conspiracy to injure) in retaliation for the WSJ

article, The Chronicle article, the Alabama Gazette article and protected speech on Plaintiff's office door.

61.    Hardgrave was openly quoted in The Chronicle article. The Chronicle article provided some coverage of the retaliation against Plaintiff and his department. Hence, Hardgrave was unquestionably aware of Plaintiff's protected activity.

62.    May 30, 2018: Hardgrave emails Aistrup direct instructions regarding Plaintiff's grievance against Hardgrave.

### Dr. Aistrup

63.    Direct actions taken by Joseph Aistrup (CLA Dean) to injure Plaintiff in retaliation for the WSJ article, The Chronicle article, the Alabama Gazette article and protected speech on Plaintiff's office door.

64.    Removing Plaintiff as Graduate Program Officer without cause or warning damaged Plaintiff's professional reputation and financially harmed Plaintiff.

### Dr. Boosinger

65.    Direct actions taken by Tim Boosinger to injure Plaintiff in retaliation for the WSJ article, The Chronicle article, the Alabama Gazette article and protected speech on Plaintiff's office door:

17

66.     **July 5, 2017 Memo:** Dr. Boosinger returned Plaintiff and his department to CLA and took away their independent budget (nearly $2 million in surplus). An independent school of economics, with approximately two million additional dollars in budget would greatly enhance Plaintiff's career as a professor and/or an administrator.

67.     Dr. Boosinger failed to approve the Department's junior hiring in Fall 2017. Plaintiff cannot succeed as a Graduate Program Officer if he cannot properly staff his programs.

## COUNT ONE
## FIRST AMENDMENT RETALIATION -
## PURSUANT TO § 1983: ALL DEFENDANTS

68.     Plaintiff adopts and re-alleges each and every allegation contained in this Complaint as if set out anew herein.

69.     In taking the above-described actions, Defendants intentionally and willfully retaliated against the Plaintiff for his constitutionally protected speech under the First Amendment, to include stripping him of his position as Graduate Program Officer.

70.     The Plaintiff's constitutionally-protected speech regarded matters of public concern, specifically, abuses in the Athletics Department, as set out in articles participated in or generated by Plaintiff in the Wall Street Journal, Chronicle of Higher Education, the Alabama Gazette, as well as his office door collage.

18

71. Said speech played a substantial part in Defendants' decision to discharge the Plaintiff as the Economics Department's Graduate Program Officer.

72. As a proximate consequence of the Defendants' violation of the First Amendment, the Plaintiff has suffered and will continue to suffer damage to his professional life and future career opportunities, future pecuniary losses, emotional pain, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and non-pecuniary damages.

73. Each Defendant committed acts to further the conspiracy.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff demands the following relief:

(a) That he be placed in the position in which he would have worked absent the Defendants' retaliatory treatment, or, in the alternative, front pay;

(b) Back pay from the date of his retaliatory removal and for the raises he should have received;

(c) Punitive damages, to deter such conduct in the future;

(d) Injunctive relief;

(e) Interest;

(f) Attorneys' fees;

(g) Costs; and

(h) Such other legal or equitable relief to which Plaintiff may be entitled.

## COUNT TWO
## CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS

19

## (42 U.S.C. § 1985)

74.    Plaintiff adopts and re-alleges each and every allegation contained in this Complaint as if set out anew herein.

75.    Plaintiff alleges that Defendants conspired to violate his civil rights in violation of 42 U.S.C. § 1985. In taking the above-described actions, Defendants intentionally and willfully conspired against Plaintiff to deprive him of his constitutionally protected speech under the First Amendment, to include stripping him of his position as Graduate Program Officer.

76.    The Plaintiff's constitutionally-protected speech regarded matters of public concern, specifically, abuses in the Athletics Department, as set out in articles participated in or generated by Plaintiff in the Wall Street Journal, Chronicle of Higher Education, the Alabama Gazette, and protected speech on Plaintiff's office door.

77.    Said speech played a substantial part in the Defendants' decision to discharge the Plaintiff as Graduate Program Officer for Department of Economics.

78.    As a proximate consequence of the Defendants' violation of the First Amendment, the Plaintiff has suffered and will continue to suffer damage to his professional life and future career opportunities, future pecuniary losses, emotional pain, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and non-pecuniary damages.

20

79. Each Defendant committed acts to further the conspiracy.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff demands the following relief:

(a) That he be placed in the position in which he would have worked absent the Defendants' retaliatory treatment, or, in the alternative, front pay;

(b) Back pay from the date of his retaliatory removal and for the raises he should have received;

(c) Punitive damages, to deter such conduct in the future;

(d) Injunctive relief;

(e) Interest;

(f) Attorneys' fees;

(g) Costs; and

(h) Such other legal or equitable relief to which Plaintiff may be entitled.

## COUNT THREE
## EQUAL PROTECTION

80. Plaintiff adopts and re-alleges the foregoing paragraphs as if fully set forth herein.

81. Defendants' conduct, as outlined herein, has deprived Plaintiff of his statutory and constitutional rights granted by the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, and § 32-26-100 et seq. At all times relevant to Plaintiff's allegations, Defendants were acting as government officials.

82. Specifically, Defendants' conduct deprived Plaintiff of his right to

Equal Protection under the law as provided by the Fourteenth Amendment of the United States Constitution.

83.     Plaintiff brings this case as a class of a few where, as a result of the investigation, suspension, and termination he was subjected to, Plaintiff was intentionally treated differently than other similarly situated individuals, even though there was no rational basis for the difference in treatment. *See Village of Willowbrook, et al., v. Olech*, 528 U.S. 562 (2000).

84.     Defendants' conduct, as described above, in investigating, suspending and terminating Plaintiff's employment was irrational and wholly arbitrary and not related to any legitimate governmental purpose. Defendants' conduct, as described above, was motivated by ill will toward Plaintiff due to the concerns that Plaintiff raised regarding the issues he discovered related to the Public Administration major.

85.     Defendants engaged in such conduct with malice and/or reckless indifference to Plaintiff's protected rights.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff demands the following relief:

(a)     That he be placed in the position in which he would have worked absent the Defendants' retaliatory treatment, or, in the alternative, front pay;

(b)     Back pay from the date of his retaliatory removal and for the raises he should have received;

(c)     Punitive damages, to deter such conduct in the future;

22

(d)     Injunctive relief;

(e)     Interest;

(f)     Attorneys' fees;

(g)     Costs; and

(h)     Such other legal or equitable relief to which Plaintiff may be
        entitled.

## COUNT FOUR
## CIVIL CONSPIRACY UNDER ALABAMA LAW:
## ALL DEFENDANTS

86.    Plaintiff adopts and re-alleges each and every allegation contained in
this Complaint as if set out anew herein.

87.    A civil conspiracy under Alabama law requires a combination of two
or more individuals to accomplish an unlawful purpose or to accomplish a lawful
purpose by unlawful means.

88.    Plaintiff's claim of civil conspiracy is brought against the defendants
named in their individual capacities.

89.    Dr. Seals is a tenured professor with Auburn University and was
Graduate Program Officer of his department. He held a property interest in that
position. Defendants conspired to illegally deprive him of that property interest by
engaging in the violation of his rights under the First Amendment to the U.S.
Constitution.

90.    Defendants conspired to illegally retaliate against Dr. Seals for
engaging in federally-protected speech and exercising his federally-protected right

to speak out on matters of public concern.

91.     Defendants conspired to deprive Dr. Seals of his civil rights.

92.     Defendants conspired to damage Dr. Seals' reputation and name by removing him from his visible position as Graduate Program Officer, which diminished his standing in the community.

93.     Defendants conspired among themselves and each Defendant committed acts to further the conspiracy.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff demands the following relief:

(a)     That he be placed in the position in which he would have worked absent the Defendants' retaliatory treatment, or, in the alternative, front pay;

(b)     Back pay from the date of his retaliatory removal and for the raises he should have received;

(c)     Punitive damages, to deter such conduct in the future;

(d)     Injunctive relief;

(e)     Interest;

(f)     Attorneys' fees;

(g)     Costs; and

(h)     Such other legal or equitable relief to which Plaintiff may be entitled.

**PLAINTIFF DEMANDS TRIAL BY A STRUCK
JURY ON ALL CLAIMS SO TRIABLE.**

24

Respectfully submitted,

Kris O. Anderson
Alabama Bar No. 4318O68A
J. Parker Yates
Alabama Bar No. 1155O68Y

*Attorneys for Plaintiff*

**OF COUNSEL**:

**KRIS O. ANDERSON**
Clark Partington
4725 Main Street Suite F-222
Orange Beach, AL 36561
Telephone: 251.225.4122
E-mail:      kanderson@clarkpartington.com

**J. PARKER YATES**
Yates Law, LLC
3541 Springhill Road
Birmingham, AL 35223
Telephone: 205.705.3144
E-mail:      parker@jpyateslaw.com

25

## PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED:

**Dr. Steven Leath**
**President of Auburn University**
**Samford Hall**
**182 S College Street**
**Auburn, AL 36849**

**Dr. William "Bill" Hardgrave**
**Provost of Auburn University**
**Samford Hall**
**182 S College Street**
**Auburn, AL 36849**

**Dr. Timothy R. Boosinger**
**254 Hedgerow Circle**
**Auburn, AL 36830-6998**

**Dr. Joseph Aistrup**
**College of Liberal Arts**
**321 Tichenor Hall**
**Auburn, AL 36849**

**Dr. Hyeongwoo Kim**
**138 Miller Hall**
**Auburn, AL  36849**