IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ALAN SEALS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-468-RAH |
| | ) | [WO] |
| STEVEN LEATH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a First Amendment retaliation case. Dr. Alan Seals, a tenured economics professor at Auburn University, alleges that university officials engaged in a campaign of retaliatory conduct toward him because he engaged in speech that was critical of university leadership and practices in putting athletics over academics.

After being removed from a program post position and filing an internal complaint with the university to no avail, Dr. Seals filed this lawsuit. In this 42 U.S.C. § 1983 action, Dr. Seals brings First Amendment retaliation claims against five university officials in their individual and official capacities: former President Steven Leath; former Provost William Hardgrave; former Provost Timothy R. Boosinger; Dean of the College of Liberal Arts Joseph Aistrup; and former Interim

Chair of the Department of Economics Hyeongwoo Kim.[1]  Through this lawsuit, Dr. Seals seeks the following relief: back pay, punitive damages, injunctive relief, and that "he be placed in the position in which he would have worked absent the Defendants' retaliatory conduct" or, alternatively, that he receive front pay.  (Doc. 13 at 23–24.)

Now pending before the Court is the Defendants' motion for summary judgment on all claims.[2]  (Doc. 29.)  The motion is fully briefed with accompanying evidentiary submissions.  Upon review, the motion is due to be granted in part and denied in part.  Of Dr. Seals's bevy of claims, the only claim that survives is his claim that Dean Aistrup removed him from his role as Graduate Program Officer because he served as a source for an article in the *Chronicle of Higher Education*.

## I. JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  Personal jurisdiction and venue are not contested.

---

[1] The Court's independent review suggests that Aistrup is no longer Dean of the College of Liberal Arts, and therefore the official-capacity claims against him may no longer be appropriate. Defendants represent that Boosinger no longer works for Auburn University and that Leath has stepped down as President of Auburn University.  Each public officer's successor is automatically substituted as a party. See Fed. R. Civ. P. 25(d).  Because the following legal analysis ultimately does not depend on whether each Defendant is sued in his official or his individual capacity, the Court will not distinguish between the two classes of defendants in this opinion. Counsel for the defendants are directed to provide the names of any substituted defendants serving in these positions in their official capacity.

[2] The Court previously entered an order granting the Defendants' motion to dismiss Dr. Seals's conspiracy claims but denying the Defendants' motion to dismiss the retaliation claims.  (Doc. 22.)

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").  If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to

each of its claims for relief exists.  *Celotex Corp.*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III.  BACKGROUND

The parties' familiarity with the evidence is presumed.  Only those facts necessary for resolution of the pending summary judgment motion are set out here. These facts are either undisputed or relayed in the light most favorable to Dr. Seals, the nonmovant.

Dr. Seals was in his fifth year as an economics professor at Auburn University when he became involved in the "PUBA" student-athlete clustering controversy. (*See* Doc. 30-1 at 5, 157.)   PUBA is shorthand for the university's Public Administration major.  This major came under criticism from several faculty members when it was revealed that there was a disproportionate "cluster" of student-athletes enrolled in the PUBA major.  (Doc. 30-5 at 10, 14–16.)

Dr. Seals and several other faculty members, primarily Dr. Michael Stern, were concerned that the clustering of student athletes in the PUBA major reflected that the university was more focused on athletes' eligibility to play sports rather than their education and preparation for a career outside of sports.  Dr. Stern began investigating this issue further, sending a formal FOIA request that later revealed

4

that "athletics representatives" were offering money to keep the heavily criticized PUBA program open and afloat.  (Doc. 30-1 at 8, 10.)

Frustrated with the administration's response to the clustering controversy, Dr. Seals, along with Dr. Stern and others, began sourcing information about the controversy to media outlets, hoping to shine a light on their concerns about the administration.

Dr. Seals alleges that his involvement with these articles, in addition to a protest collage that he affixed to his office door, motivated the Defendants to engage in a campaign of retaliation against him that included his demotion from his post as a Graduate Program Officer (GPO), a position that paid him an extra $20,000 a year.[3]

**A. Dr. Seals's Speech**

Dr. Seals's speech at issue concerns four chronological acts: (1) his involvement with a *Wall Street Journal* article, (2) his involvement with an *Alabama Gazette* article, (3) the collage he posted on the outside of his office door, and (4) his involvement with *The Chronicle of Higher Education* article.

---

[3] Dr. Stern filed a First Amendment retaliation lawsuit of his own against the same defendants. Several of Dr. Stern's claims for First Amendment retaliation including his demotion from chair, his failure to receive an annual evaluation, and the denial of a raise and merit supplement are set for trial before a different judge of this Court.  (Doc. 160 in *Stern v. Roberts, et al.*, Case No. 18-cv-807-CLM (M.D. Ala.).)

### 1. *Wall Street Journal* Article[4]

In August 2015, the national media began covering the unfolding controversy surrounding the PUBA major and student-athletes at Auburn. The *Wall Street Journal* published an article titled "At Auburn, Athletics and Academics Collide," with a subtitle stating, "Documents show athletic department lobbied to save a major favored by athletes." (Doc. 30-1 at 133–36.) Dr. Seals served as one of the article's main sources, and he claims that his contribution to the article was his first relevant act of protected speech. (*Id.* at 26.) Dr. Seals, however, was not mentioned or quoted anywhere in the article, nor was he referenced as a source. (*See id.* at 133–36.) While the Defendants were aware of the article, none of the Defendants knew Dr. Seals played a role in the article until after Dr. Seals filed this lawsuit. (Doc. 31 at 16.)

### 2. *Alabama Gazette* Article[5]

On November 1, 2015, three months after the *Wall Street Journal* article was published, the *Alabama Gazette* published an op-ed piece titled "All the Speaker's Men and the Collapse of AU Athletics." This piece covered the same ground as the

---

[4] Ben Cohen, *At Auburn, Athletics and Academics Collide*, THE WALL ST. J. https://www.wsj.com/articles/at-auburn-athletics-and-academics-collide-1440635278, (last updated Aug. 28, 2015).

[5] John Sophocleus, *All the Speaker's Men and the Collapse of AU Athletics*, THE ALA. GAZETTE (Nov. 1, 2015), https://www.alabamagazette.com/story/2015/11/01/news/all-the-speakers-men-and-the-collapse-of-au-athletics/597.html.

*Wall Street Journal* article, but unlike the *Wall Street Journal* article, the *Gazette* article's postscript specifically thanked Dr. Seals for his assistance: "[M]any thanks to Professor[] Seals . . . for data input on this column . . . ." (Doc. 30-1 at 16–17, 129–31.) The main text of the article did not mention or quote Dr. Seals in any way.

Notably, the *Gazette* had a much smaller following than the *Wall Street Journal*, distributing roughly 10,000 copies per issue. (Doc. 31 at 10.) Perhaps because of this smaller readership, word of the article did not spread to most of the Defendants until after this lawsuit was filed. Of the Defendants, only Provost Boosinger was aware of the article before this suit was filed. (*Id.* at 11.) Boosinger believes he learned about the article around the time it was published. (Doc. 30-4 at 14; Doc. 30-5 at 27–28, 32.)

### 3. The Collage[6]

Dr. Seals's campaign against university administrators did not end with these first two articles. Sometime after the *Gazette* article was published, Dr. Seals posted several images on the outward-facing side of his office door at the university. (Doc. 30-1 at 20–25.) Together, these images became a "door collage."

The content of the collage, Dr. Seals admits, was purposefully "outrageous," as it featured photos of several controversial public figures such as North Korean dictator Kim Jong-Un, Soviet Union dictator Joseph Stalin, Italian dictator Benito

---

[6] *See* Appendix for an image of the collage.

Mussolini, convicted child molester and former Subway spokesperson Jared Fogle, and then-presidential-candidate Donald Trump. (*Id.* at 20–25.) Interspersed among these depictions were photos of university administrators and personnel, including three of the Defendants—Dean Aistrup, Provost Boosinger, and Provost Hardgrave. (*Id.*) Aubie the Tiger, the university's mascot, was also present in the collage. (*Id.* at 22.) The collage did not contain any explanatory text about what the collage meant or intended to say, leaving the takeaway of the artistic expression entirely up to the audience. Dr. Seals testified, however, that he "tried to create something through [the collage] that was as outrageous as I felt [the conduct of these administrators] was." (*Id.* at 25.)

The Defendants claim varying degrees of knowledge about the collage while it was displayed. President Leath says he knew nothing about the collage while it was up, as it had been voluntarily taken down by the time President Leath arrived at Auburn in 2017. (Doc. 30-10 at 4.) Provost Boosinger, then-Professor Kim, then-Dean Hardgrave, and Dean Aistrup learned about the collage sometime after it had been posted. (Doc. 30-5 at 25; Doc. 30-7 at 37; Doc. 30-8 at 3; Doc. 83-1 at 2.)

On October 18, 2016, after someone sent Dean Aistrup a picture of the collage, Dean Aistrup forwarded the picture to Dr. Seals in an email which stated the following:

See the attached.  I'm very upset.  First, this picture was taken a day before I went to my hair stylist.  My hair looks like I've been in a hurricane.  And then, it pictures me with Jay Jacobs, whose hair is always immaculate.  I hate that Jay Jacobs.  And then, to make matters worse, the image does not depict my good side.  And yes, I have a good side.

If you are going to put a picture of me on your door, it needs to be a good picture.  Please come to my office and take a better photo of me.  And then, please take down that photo of me with Jay.

War Eagle,
Joe

(Doc. 83-1 at 2.)

A week later, Dean Aistrup and Dr. Seals encountered each other at a faculty meeting.   There, Dean Aistrup approached Dr. Seals and handed him a headshot/photograph of himself, with an offer to autograph it and stating, "To my BFF Alan, may the wings of corruption carry you far."  Dr. Seals accepted the photograph and switched the old photo of Dean Aistrup with the new one.  Aistrup testified that the email and in-person exchange was his way of humorously addressing the collage.  (Doc. 30-3 at 32–33.)

The collage remained on the door from late 2015 through the summer of 2017, when Dr. Seals's office was moved to another building on campus.  (Doc. 30-1 at 20, 29.)

### 4. *Chronicle of Higher Education* Article[7]

On February 16, 2018, almost three years after the *Wall Street Journal* article was published, and seven months after Dr. Seals had removed the collage, Jack Stripling wrote and published an article with *The Chronicle of Higher Education* titled "Inside Auburn's Secret Effort to Advance an Athlete-Friendly Curriculum." (Doc. 30-1 at 139–53.)  Dr. Seals spoke frequently with Stripling over the phone as Stripling prepared the article.  (Doc. 30-1 at 37.)

While not explicitly naming Dr. Seals anywhere in postscript or the text, the *Chronicle* article alluded to Dr. Seals, mentioning in relevant part that:

> Some economics faculty members say that they are convinced that the dean has it in for them, and that the feud has gotten personal.  The antipathy is so strong that no one seemed to blink when a professor put a picture of Aistrup arm in arm with Jacobs, the athletics director, on his office door, alongside photos of Joseph Stalin and Kim Jong-un.

(Doc. 30-1 at 152.)

The day after the *Chronicle* article was released, Stripling tweeted a picture of the collage that Dr. Seals had previously emailed to him, stating:  "There's a war between Auburn whistleblower's dept & dean who tried to shut him up. 1 prof posted photos of Dean & AD (Just below) alongside Stalin & Kim Jong-Un . . . ."[8]

---

[7] Jack Stripling, *Inside Auburn's Secret Effort to Advance an Athlete-Friendly Curriculum*, CHRON. OF HIGHER EDUC. (Feb. 16, 2018), https://www.chronicle.com/article/inside-auburns-secret-effort-to-advance-an-athlete-friendly-curriculum/.

[8] Jack Stripling (@JackStripling), TWITTER (Feb. 17, 2018, 6:55 AM), https://twitter.com/jackstripling/status/964845789850808321.

Dean Aistrup, Provost Hardgrave, and President Leath admit that they read the *Chronicle* article shortly after it was published.  (Doc. 30-2 at 13; Doc. 30-3 at 44, 63; Doc. 30-6 at 2–3; Doc. 30-7 at 18; Doc. 30-10 at 4.)  None of them, however, admit to being aware that Dr. Seals was a source for the article, and none of them admit to being aware of Stripling's collage tweet.

**B. The Retaliatory Acts**

Dr. Seals alleges that, based on his speech, the five Defendants engaged in a campaign of retaliation against him beginning from dates prior to the *Wall Street Journal* article's publication until well after publication of the *Chronicle* article—a period of more than four years.  These acts are individually outlined below and summarized in a chart at the end of this section.

**1.  Hesitance to Move the Economics Department out of the Haley Center Basement**

From 2009 until the summer of 2017, the Economics Department was housed in the basement of the Haley Center on campus.  To Dr. Seals, the department's location in the Haley Center felt like being "stuffed away in a windowless basement," which affected him personally and professionally.  (Doc. 30-1 at 18, 26–27, 33–34, 66.)

Many faculty members in the Economics Department requested that the department be moved out of the basement.  In April 2015, the administration proposed a renovation that included the transfer of the department from Haley Center

to Miller Hall.  This proposal was quickly accepted by department faculty, and thereafter, in the summer of 2017, the Economics Department was moved to Miller Hall.  (Doc. 30-1 at 19–20; Doc. 30-2 at 8–10; Doc. 30-4 at 9; Doc. 30-5 at 23.)

Dr. Seals alleges that the time it took for the Economics Department to be relocated out of the Haley Center basement was an adverse action made in retaliation against him for his speech.

### 2.  Failure to Provide "Resources" to the Economics Department

Dr. Seals also contends, without specificity, that the Defendants retaliated against him by limiting the Economics Department's resources, which "could deprive [Seals] of career opportunities for advancement." (Doc. 81 at 56.)  Despite acknowledging that it is a nebulous idea, Dr. Seals claims that the administration "blocked [the economics department's] hiring" of new professors to replace retiring faculty.  (Doc. 30-1 at 36–37, 66.)

### 3.  Dr. Seals's Exchanges with Dean Aistrup about the Collage

Dr. Seals further alleges that Dean Aistrup's October 18, 2016 email to Dr. Seals asking for the placement of a different picture of him on the collage constituted intimidation and an adverse action.  Likewise, Dr. Seals alleges that the subsequent in-person conversation with Dean Aistrup about Aistrup's picture in the collage constituted an intimidating adverse action.

12

### 4. Refusal to Create an Independent School of Economics and the Return of the Economics Department to the College of Liberal Arts

Dr. Seals alleges that the university took an adverse employment action against him when it decided to return the Economics Department to the College of Liberal Arts (CLA) in July 2017.  (Doc. 81 at 49.)  Historically, the Economics Department resided under the CLA's governing umbrella, but in January 2017 the department was temporarily placed under the authority of the Provost's Office as opposed to the CLA dean.  (Doc. 30-4 at 9–10.)  During this time, economics faculty members lobbied the administration to create an independent "School of Economics" with a budget, staff, and other operational elements attendant to an independent school.  (Doc. 30-4 at 10–11; Doc. 30-15 at 2–4.)  These lobbying efforts failed.  In July 2017, the administration returned the Economics Department to the purview of the CLA.  (Doc. 30-4 at 11.)

### 5. Dr. Seals's Removal as GPO

On March 22, 2018, Dr. Seals sent an email to President Leath in which he voiced his concerns about the state of the Economics Department:

> From the moment you [President Leath] took office, our department has moved into some sort of weird purgatory at the university.  As a faculty member at Auburn, I have become partially numb to this sort of gross ineptitude from my "superiors."  However, your relocation to allow the normal operations of the department to continue . . . is outrageous. . . .  Given our recent circumstances and your failure to provide any explanation for the past year nor any forward guidance, I have no alternative but to inform our incoming graduate students that

13

we will likely not be able to provide them adequate training in graduate economics.  I will instruct them to go elsewhere if they can.  I will also give this same information to our first-year students.  I will neither recruit nor admit any more students as to do so, given the present circumstances, would be unethical.

(*Id.* at 161.)

On May 25, 2018, three months after the *Chronicle* article was published and two months after Dr. Seals sent President Leath the email, Dean Aistrup removed Dr. Seals from his position as GPO, a position in which he had served for two years, which paid him an extra $20,000 annually, and which improved his performance score on his faculty evaluation.  (Doc. 30-1 at 45–48, 165, 210.)  As GPO, Dr. Seals served two primary functions: (1) recruiting students into the Economics Department's graduate program, and (2) overseeing administration of graduate students' qualifying exams.  (*Id*. at 46.)

Dean Aistrup notified Dr. Seals of his removal via an email, stating:

Dr. Seals,

Effective immediately you are no longer the GPO for Economics.
Thank you for your service to Auburn University and the College of Liberal Arts.

Dean Aistrup

(*Id.* at 165.)

In his deposition, Dean Aistrup testified that Dr. Seals was removed as GPO because of the March 22, 2018 email, which Dean Aistrup characterized as

insubordinate and a declaration that Dr. Seals would no longer fulfill his duties as GPO. (Doc. 30-3 at 40, 43.) Dean Aistrup however did not give Dr. Seals this reasoning *when* he sent the email. In fact, Dean Aistrup gave Dr. Seals no reasoning as to why he was being removed. (Doc. 30-1 at 165.) Further, Dean Aistrup acted outside the standard procedure for the removal of GPOs, which was usually left to departmental leaders. (Doc. 82-10 at 2–5.) While the action was nevertheless permissible under the university's rules, even Dean Aistrup described his decision to remove Dr. Seals from his GPO position as unusual. (Doc. 30-3 at 60–61.)

Notably, on that same day, Dr. Seals's co-critic, Dr. Stern, was removed as Chair of the Economics Department. (Doc. 30-1 at 14, 17, 36; Doc. 30-3 at 60.) Dr. Kim replaced Dr. Stern as Chair of the Economics Department—and became the direct supervisor to Dr. Seals. (Doc. 30-9 at 6.)

On August 31, 2018, Dr. Seals filed an internal grievance against Dean Aistrup and Provost Hardgrave, alleging that they had retaliated against him "for engaging in criticism of the Auburn administration" by removing him as GPO. (Doc. 30-1 at 162–64.) Dr. Seals's grievance requested that he be immediately reinstated as GPO and that Aistrup and Hardgrave issue a letter of apology. (*Id.* at 164.) The Auburn Grievance Committee later denied Dr. Seals's grievance and request. (*Id.* at 62.)

### 6. Teaching Assistant Hours

After being removed as GPO, Dr. Seals sought approval from Dr. Kim for "ten to fifteen" teaching assistant (TA) hours for his upcoming courses. (Doc. 30-1 at 60.) Dr. Kim, the presiding department chair at the time, granted Dr. Seals's request, approving him for ten TA hours. (*Id*. at 202.) Dr. Kim testified that he has not approved any other similarly situated professors for more hours than Dr. Seals received. (Doc. 30-9 at 22.)

Despite having received the low end of the hour range that he requested, Dr. Seals argues that Dr. Kim's approval of only ten hours constituted an adverse reduction in TA hours: an action taken by Dr. Kim that was designed to "mess with" Dr. Seals. (Doc. 30-1 at 60.)

### 7. Failure to Appoint Dr. Seals to the Graduate Program Committee

As Chair, Dr. Kim was not only responsible for approving TA hours, but he also oversaw the various committees within the Economics Department. (Doc. 30-8 at 3.) In July 2018, Dr. Kim formed a new committee: the Graduate Program Committee. (Doc. 30-9 at 15.) Dr. Seals was not asked to join this committee because of his involvement with the student-athlete articles, according to Dr. Seals. Service on committees, such as this one, factors favorably into faculty evaluations, which translate to increases in salary. (Doc. 30-9 at 14–15, 18–20.)

16

According to Dr. Kim, not every faculty member was asked to serve on every committee.  Rather, faculty members were approached based on the chair's evaluation of their time, availability, and expertise.  (Doc. 30-8 at 3.)  Dr. Kim further stated that no faculty were purposefully excluded from any committee by him, or at the direction of higher-up leadership.  (*Id.*)

Notably, since Dr. Kim became the Chair of the Economics Department, Dr. Seals has served on two other committees: a hiring committee and an academic program review committee.  (Doc. 30-9 at 20.)

### 8.  2019 Merit Raise and Payment

Dr. Seals also contends that Dr. Kim—acting on behalf of Dean Aistrup and Provost Hardgrave—retaliated against him by only raising his salary by 2.6% and by not providing him with a "market adjustment" raise in 2019.  (Doc. 30-9 at 11; Doc 81 at 32–33.)  Dr. Seals's salary increase was based on his April 2019 Faculty Annual Review (FAR) evaluation, conducted by Dr. Kim.  (Doc. 30-9 at 11, 18.) "Market adjustment" raises are a separate consideration from the FAR evaluation and are discretionarily awarded by Dr. Kim based on a professor's research, among other considerations.  (*Id.* at 9.)

### 9. Overview of Acts of Alleged Retaliation

| Acts of Alleged Retaliation | Date of Occurrence | Individual Responsible |
|---|---|---|
| (1) Hesitance to move the Economics Department out of the Haley Center basement | January 2014 through April 23, 2015[9] | Provost Boosinger |
| (2) Failure to provide "resources" (e.g., additional faculty) to the Economics Department | January 2014 through Present | Dean Aistrup, Provost Boosinger, Provost Hardgrave, and President Leath |
| (3) Email exchange between Dean Aistrup and Dr. Seals regarding the collage | October 18, 2016 | Dean Aistrup |
| (4) In-person exchange between Dean Aistrup and Dr. Seals regarding the collage | October 24, 2016 | Dean Aistrup |
| (5) Refusal to create an independent School of Economics and the return of the Economics Department to the CLA | July 5, 2017 | Dean Aistrup, Provost Boosinger, and President Leath |

---

[9] On April 23, 2015, President Gogue and Provost Boosinger sent the following joint memorandum, indicating that Boosinger was receptive to relocating the Economics Department and outlining a timetable from which the department could move:

> There are two options for relocating the Department of Economics. The preferred option is for the department to relocate to a floor in Miller Hall once the School of Nursing has been relocated into its new building and all appropriate repairs and renovations to Miller Hall are accomplished. The current timeframe for this move is sometime in the 2017–2018 academic year. However, physical constraints and unforeseen problems could delay this move.

> The second option is for the tenured and tenure track faculty members of the Department of Economics and its main office staff to relocate into the Haley Center tower, if Dean Aistrup can find the requisite number of offices with windows for your faculty to occupy by relocating other employees of CLA. If this option is selected then the Department of Economics personnel will not be relocated to Miller as proposed in option one above.

(Doc. 30-4 at 26.)

| | | |
|---|---|---|
| (6) Removal as GPO | May 25, 2018 | Dean Aistrup, Provost Hardgrave, and President Leath |
| (7) Approval for ten TA hours | August 2018 | Department Chair Kim |
| (8) Failure to appoint to graduate program committee | July 2018 through April 2019 | Department Chair Kim |
| (9) "Low" 2019 raise | Fall 2019 | Department Chair Kim, Dean Aistrup |

(Doc. 31 at 42.)

## IV.  DISCUSSION

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citations omitted).  A government employer may not take an adverse action against a public employee in retaliation for speech protected under the First Amendment.  *See generally Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 283–84 (1977).  However, "a public employee's free speech right is not absolute."  *Polion v. City of Greensboro*, 614 F. App'x 396, 398 (11th Cir. 2015) (citing *Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013)).  A public employee faces additional limitations in his freedom of speech since "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  The courts therefore aim to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the

19

interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*; *see also Stern v. Leath*, No. 3:18-CV-807-WKW, 2022 WL 988376, at *19 (M.D. Ala. Mar. 31, 2022).

But before this balance is struck, the Court must determine as a preliminary matter whether an employee suffered an adverse employment action. [10] *Buending v. Town of Redington Beach*, 10 F.4th 1125, 1135 (11th Cir. 2021).  Once a public employee plaintiff shows that he has suffered an adverse employment action, a "four-stage analysis" governs the First Amendment retaliation claim.  *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015).

Dr. Seals brings numerous retaliation claims that, while all relating to his criticism of university leadership, involve different acts of speech, different allegedly retaliatory actions, different defendants, and different times.  All told, three claims are time-barred, four claims do not constitute actionable adverse employment actions, and one claim does not survive analysis under the four-step public employment framework.  The only surviving claim is Dr. Seals's allegation that Dean Aistrup removed Dr. Seals as GPO in retaliation for his involvement, or perceived involvement, with the *Chronicle* article.  The Court will first discuss the timeliness and sufficiency of the alleged adverse actions, then it will address the

---

[10] In this opinion, the phrases "adverse employment action," "acts of retaliation," and "retaliatory acts" are used interchangeably.  *See Stern*, 2022 WL 988376, at *13 n.11.

merits of the surviving claims under the *Pickering* and *Garcetti* framework analyzing the free speech rights of public employees.

## A. Several Retaliatory Actions Are Either Time-Barred or Otherwise Unactionable

As a threshold matter, the Defendants contend that several of the allegedly retaliatory acts are either time barred or are not sufficiently adverse to state a retaliation claim. For the most part, the Court agrees.

### 1. The Time-Barred Claims

The statute of limitations for § 1983 claims brought in Alabama is two years. *See Powell v. Thomas*, 643 F.3d 1300, 1303 (11th Cir. 2011); *see also Stern*, 2022 WL 988376, at *13. The two-year statute of limitations begins to run when the plaintiff knew or should have known of his injury and its cause. *Rozar v. Mullis*, 85 F.3d 556, 561–62 (11th Cir. 1996) (holding that a claim accrues when "the facts which would support a cause of action [were] apparent or should [have been] apparent to a person with a reasonably prudent regard for his rights"). Accordingly, the statute of limitations began running once Dr. Seals knew or should have known that a defendant has retaliated against him for engaging in protected speech.

The Defendants argue that all acts of alleged retaliation occurring before July 2, 2017—two years before Dr. Seals filed this lawsuit—are time-barred, including those based on (1) Provost Boosinger's hesitancy in 2014 and 2015 to move the Economics Department out of the Haley Center basement; (2) the October 18, 2016

email from Dean Aistrup regarding Dr. Seals's door collage; and (3) the October 24, 2016 in-person conversation between Dean Aistrup and Dr. Seals in which Dean Aistrup gave Dr. Seals a replacement photo to put on the collage.

For his part, Dr. Seals acknowledges that these retaliatory acts, which accrued prior to July 2, 2017, fall outside the statute of limitations, and are therefore time-barred.  Dr. Seals argues, however, that the continuing violation doctrine permits him to sue on these otherwise time-barred claims because they are part of a campaign of retaliation that extended into the actionable time-period.  This argument is unpersuasive.

"The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period."  *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006).  The Eleventh Circuit has limited the doctrine "to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred."  *Id.* at 1335.  The doctrine does not apply where a plaintiff sues over *discrete* acts.  *See City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002) ("In determining whether a discriminatory employment practice constitutes a continuing violation, this Circuit distinguishes between the present consequence of a one time violation, which does not extend the limitations period, and the continuation of that violation into the present, which does." (internal quotation and

citation omitted)).   That is, "each discrete act starts a new clock, and 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'"   *Stern*, 2022 WL 988376, at *13 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).   "The continuing violation doctrine originated in Title VII jurisprudence, but the Eleventh Circuit has extended the doctrine to claims under § 1983." *Id.* at *14 (citing *Morgan*, 536 U.S. at 113; *Rojas*, 311 F.3d at 1101–02).

Dr. Seals's complaints about (1) Provost Boosinger's hesitancy in 2014 and 2015 to move the Economics Department out of the Haley Center basement; (2) the October 18, 2016 email from Dean Aistrup regarding the collage; and (3) the October 24, 2016 in-person conversation between Dean Aistrup and Dr. Seals are discrete retaliatory acts that Dr. Seals knew of and believed to be violations when they occurred.   *See Stern*, 2022 WL 988376, at *14 (finding that a similar allegedly "ongoing campaign of harassment . . . that began prior to but extended into the limitations period" was not an "ongoing violation" because the retaliatory acts were discrete violations and because each act was known to the defendant and understood to be violative when it occurred).   In fact, Dr. Seals testified that he understood each act to be a violation in and of itself.   (*See* Doc. 30-1 at 26.)   Furthermore, the Supreme Court has held that discrete retaliatory acts, even if related, do not constitute a single continuing violation, in contrast to hostile work environment claims, which often

consist of patterns of behaviors that are not actionable on their own. *Morgan*, 536 U.S. at 110–15.

Therefore, to the extent that Dr. Seals brings First Amendment retaliation claims based on alleged retaliatory acts occurring prior to July 2, 2017, summary judgment is due to be granted as to those claims because they are time-barred.[11]

### 2. The Otherwise Unactionable Claims

The Defendants also assert that certain other alleged retaliatory acts are not sufficiently adverse or pertinent to be actionable, including (1) those that constitute institutional decisions and (2) those that do not specifically relate to Dr. Seals.

"[W]hether an employee suffered an 'adverse employment action' is a 'preliminary matter' that must be resolved first" when an employee brings a First Amendment retaliation claim. *Buending*, 10 F.4th at 1135 (citation omitted). The standard for what constitutes an adverse action in the Eleventh Circuit is admittedly "muddled." *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021) (flagging the "potential intra-circuit conflict" regarding the definition of adverse employment action but declining to resolve the issue); *see also Stern*, 2022 WL 988376, at *18 (same). This muddled precedent presents, in short, two different tests

---

[11] While time-barred, Boosinger's hesitancy in 2014 and 2015 to move the Economics Department out of the Haley Center basement also constitutes an unactionable institutional decision. *See Stern*, 2022 WL 988376, at *18.

for adversity: (1) the *Stavropoulos* test that defines an adverse employment action as one that "involve[s] an important condition of employment" such as "discharges, demotions, refusals to hire or promote, and reprimands," *see Stavropoulos v. Firestone*, 361 F.3d 610, 619 (11th Cir. 2004), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); and (2) the *Bennett* test that defines an adverse employment action as one that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights," *see Bennett v. Hendrix*, 423 F.3d 1247, 1250–51 (11th Cir. 2005) (internal quotation and citation omitted).  While "qualitatively different," these tests do share a common element: "both ask whether the challenged conduct would, objectively, chill or deter the exercise of constitutionally protected speech."  *Bell*, 6 F.4th at 1379 (citing *Stavropoulos*, 361 F.3d at 619; *Bennett*, 423 F.3d at 1250).

### a. Institutional Decisions Affecting the Economics Department

The Defendants argue the following alleged retaliatory actions constitute institutional decisions that cannot form the basis of an actionable adverse action specific to Dr. Seals: (1) the refusal to create an independent School of Economics and the decision to return the Economics Department to the College of Liberal Arts (July 5, 2017), and (2) resource allocations to the Economics Departments budget and faculty hiring.  According to them, "major institutional decisions" like department creation and governance are not the kind of actions that constitute an

adverse employment action.  (Doc. 84 at 15–16.)  Dr. Seals argues these decisions impacted his pay and career opportunities.  (Doc. 81 at 56.)

The Court concludes that a general, institutional decision determining for example the governing umbrella of a specific department is not the type of decision that qualifies as an adverse employment action.  *See Stern*, 2022 WL 988376, at *18–19 (finding that Auburn's decision to refuse to "establish an independent school of economics" and to "return the economic department to the College of Liberal Arts" is not an adverse employment action).  After all, while a professor, like Dr. Seals, "may be professionally affected by these decisions, . . . he or she does not suffer a sufficient personal effect from the decisions that is distinct from the effect on the University generally."  *Id.* at *18.  And in any event, Dr. Seals has presented no evidence—outside of his speculative belief—that had the university decided to create an independent school of economics, Dr. Seals would have received a specific material benefit, like a pay raise.

Lacking any personal harm that would dissuade someone from exercising his constitutional rights, and therefore lacking an adverse employment action, summary judgment is due to be granted as to Dr. Seals's retaliation claims related to the university's refusal to create an independent economics department and allocate more resources to the department.

### b. Dr. Seals's Personal Benefits

The Defendants also challenge the claimed adversity of several decisions directly pertinent to Dr. Seals, including (1) Dr. Kim's decision to only authorize ten TA hours to Dr. Seals for the Fall 2018 econometrics class, and (2) Dr. Kim's decision not to select Dr. Seals for the graduate program committee. Based on the circumstances of this case, viewed in the light most favorable to Dr. Seals, the Court concludes that neither decision rises to the level of an actionable adverse employment action.

As to the TA hours, Dr. Seals originally requested "10-15" TA hours. (Doc. 30-1 at 60.) Dr. Kim ultimately approved Dr. Seals for ten hours per week, a figure within Dr. Seals's requested range. (*Id.* at 202.) Dr. Seals challenged this allotment (despite it being within his requested range) and later requested thirteen hours. (*Id.* at 201.) In response, Dr. Kim gave his justification for the ten hours and invited Dr. Seals to discuss the TA hours allotment further: "If I am missing something, please stop by and chat with me when it is convenient to you." (*Id.* at 200.) Dr. Seals declined this invitation but did reply back with a lengthy email discussing many other matters, including a "wish list" that contained two requests (both of which were unrelated to TA hours) and a statement that "if you [Dr. Kim] think you can handle those two very simple requests, then you will not have any problem from me and get my best effort in my assigned duties." (*Id.* at 199–200.) Dr. Kim replied

and approved both requests.  (*Id.* at 198–99.)  Dr. Seals made no more mention of the TA hours issue, having been approved for ten—a number within the range he initially requested.  (*Id.* at 195–98.)

The facts of this case do not involve a situation in which a professor's allotted TA hours were meaningfully reduced.  Rather, Dr. Seals was approved for TA hours within the range he initially requested.  And when he was invited to speak further about his TA hours allotment, Dr. Seals declined, opting instead to make two unrelated requests that Dr. Kim granted.  Such an employment decision would not "likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Bennett*, 423 F.3d at 1250 (internal quotation and citation omitted).  Accordingly, the Court concludes that Dr. Seals has failed to show that his allocation of ten TA hours constitutes an actionable adverse action.

Similarly, Dr. Kim's decision not to appoint Dr. Seals to a specific departmental committee is not a sufficiently adverse employment action to state a retaliation claim either.  Dr. Seals takes umbrage with the fact that Dr. Kim did not appoint him to the graduate program committee, a decision that Dr. Seals claims would impact his merit raises.  Further, while Dr. Seals was not placed on the graduate program committee, Dr. Kim did select him to serve on other departmental committees.  This is not the case of a complete lockout from intra-departmental committees and leadership; rather, this is the case of a plaintiff not being put on a

28

committee of his preference.  The failure to be discretionarily appointed to a specific departmental committee, despite being appointed to other committees, would not dissuade a person of "ordinary firmness" from engaging in protected speech.[12]  *See, e.g., Montgomery v. Hugine*, No. 5:17-CV-1934, 2019 WL 2601545, at *10 (N.D. Ala. June 25, 2019) (finding that the failure to appoint a university's board of trustee member to a certain committee was not an adverse employment action because "plaintiff's position as a board member was not affected by his non-appointment to some unspecified committee"); *Scott v. City of Sioux City*, 68 F. Supp. 3d 1022, 1033 (N.D. Iowa 2014) (finding that a plaintiff's removal from two city council committees was, as a matter of law, not "likely to dissuade a reasonable worker from engaging in protected conduct" and therefore was not an adverse action); *Bickerstaff v. Vassar Coll.*, 354 F. Supp. 2d 276, 281 (S.D.N.Y. 2004), *aff'd,* 160 F. App'x 61 (2d Cir. 2005) (finding that a college's failure to give a professor influence over hiring decisions was not an adverse employment action).

Therefore, summary judgment is due to be granted as to all retaliation claims based on (1) Dr. Kim's allotment of ten TA hours to Dr. Seals and (2) Dr. Kim's decision not to appoint Dr. Seals to the graduate program committee.

---

[12] Even assuming that Dr. Seals suffered an adverse action when he was not selected for the graduate program committee, Dr. Seals has nonetheless failed to present sufficient evidence that Dr. Kim's decision was "substantially motivated" by Dr. Seals's speech.  Dr. Seals primarily alleges that Dr. Kim was making his decisions to curry favor with his superiors (which is itself speculative), and not because he was antagonistic to Dr. Seals's speech.  (Doc. 81 at 66.)

**B.  The Surviving Claims of Retaliatory Actions**

Two allegedly retaliatory actions remain for further analysis: (1) Dr. Seals's removal as GPO, and (2) Dr. Seals's allegedly "low" 2019 raise.

Once a public employee plaintiff shows that he has suffered an adverse employment action, a "four-stage analysis" governs the First Amendment retaliation claim.  *Moss*, 782 F.3d at 617–18.  First, the employee must have spoken as a citizen on a matter of public concern.  *Id.*  If so, then the court must weigh and determine whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service.  *Id.* at 618.  These first two issues are questions of law that are decided by the court.  *Id.* (citing *Battle v. Bd. of Regents*, 468 F.3d 755, 760 (11th Cir. 2006)).  "The court's resolution determines whether [p]laintiff's speech is protected by the First Amendment."  *Id.*

"If his speech is so protected, the third stage of the analysis requires [p]laintiff to show that [the speech] was a substantial motivating factor in his termination."  *Id.* If a plaintiff makes this showing, the burden shifts to the employer to prove the fourth and final issue by a preponderance of the evidence: "that [the government employer] would have [retaliated against] [p]laintiff even in the absence of his [protected] speech."  *Id.*  "Because these final two [causation] issues . . . are questions of fact, a jury resolves them unless the evidence in undisputed."  *Id.*

With this four-stage framework in mind, the Court will now analyze the

remaining acts of retaliation, starting with whether Dr. Seals's speech was protected and ending with whether the adverse action would have been taken absent the protected speech.  Only one claim against one defendant will survive this analysis: Dr. Seals's allegation that Dean Aistrup demoted him as GPO because of his involvement with the *Chronicle* article.  Summary judgment is granted as to all other claims.

### 1.  What Speech is Protected Speech?

To qualify as protected speech, a public employee must demonstrate (1) that the speech "addressed a subject of public concern" and (2) that he "spoke in his capacity as a citizen, rather than as an employee."  *Moss*, 782 F.3d at 618 (citing *Hubbard v. Clayton Cnty. Sch. Dist.*, 756 F.3d 1264, 1267 (11th Cir. 2014)).  Dr. Seals asserts that his involvement in the three articles and his office-door collage constitute protected speech.  The articles may, but the collage does not.

### a.  The Collage[13]

The Defendants argue that Dr. Seals cannot state a retaliation claim based on his office-door collage because Dr. Seals's "office door collage is not protected as a

---

[13] Artistic and expressive collages can constitute protected speech in certain contexts.  "One of the fundamental rights secured by the [First] [A]mendment is that of free uncensored artistic expression—even on matters trivial, vulgar, or profane." *Berger v. Battaglia*, 779 F.2d 992, 1000 (4th Cir. 1985) (citing *Winters v. New York*, 333 U.S. 507 (1948)).  The inquiry here is whether that artistic expression was spoken as a citizen and whether it touched on a matter of public concern.

matter of law under *Garcetti* and *Pickering*." (Doc. 31 at 36–42.) The Defendants argue that Dr. Seals's collage did not address a matter of public concern for two reasons: (1) the collage was located on an internal office door in a school hallway; (2) the collage was informal; and (3) the collage lacked accompanying context.

Dr. Seals responds that the collage did address a matter of public concern because it was motivated by, and meant to address, Dr. Seals's "criticism of the University and certain administrators for their corruption and involvement in the PUBA scandal." (Doc. 81 at 46.)

The Defendants' argument carries the day on the public concern question. When determining whether speech touches on a matter of public concern, courts consider "the content, form and context of a given statement, as revealed by the whole record." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (citation omitted). Speech relates to a matter of public concern when it is "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). In the public higher education setting, the Eleventh Circuit has held that "speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection." *Maples v. Martin*, 858 F.2d 1546, 1552–53 (11th Cir. 1988) (collecting cases and outlining that speech criticizing salaries, tenure decisions, a proposed course syllable, and course assignments is unprotected). The Eleventh Circuit has

32

also held though that "teachers whose speech directly affects the public's perception of the quality of education in a given academic system find their speech protected." *Id.* at 1553 (collecting cases and outlining that protected speech includes speech that addresses funding issues, admission policies, and accreditation standards).

Dr. Seals's *motivation* and *intent* for the collage was clearly to address a matter of public concern.  Dr. Seals testified that the collage was meant to address the university's approach to the PUBA controversy, which would certainly affect "the public's perception of the quality of education in a given academic system." *Id.* But Dr. Seals's motivation for speech is not dispositive; rather, the speech's "content, form, and context" is what the Court is tasked with analyzing.  *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988) ("[F]ocusing solely . . . on the employee's motivation [] does not fully reflect the Supreme Court's directive that the content, form, and context of the speech must all be considered.").

Anyone who saw the collage itself could *not* conclude that the collage was about the student-athlete clustering controversy, let alone about any other specific issue relating to the university's administrative choices.  The collage featured no speech whatsoever indicating what specific public concern was being addressed. Rather, the collage included portraits of several university administrators next to several public figures, including Kim Jong-Un, Joseph Stalin, Benito Mussolini, Donald Trump, and Jared Fogle.  A reasonable observer could conclude that the

collage is meant to say that the administrators are somehow *like* mass-murderers, authoritarian dictators, a controversial presidential candidate, and a sex offender. But it does not say *how* or *why* the administrators are like these figures.  Are the administrators like these people because of the speaker's private grievances against them? *See Alves v. Bd. of Regents*, 804 F.3d 1149, 1166 (11th Cir. 2015) (holding that personal grievances about workplace management will not receive constitutional protection).  Or are the administrators like these people because of Dr. Seals's professional grievances against them? *See Anderson-Free v. Steptoe*, 970 F. Supp. 945, 961 (M.D. Ala. 1997) (citation omitted) (finding that "matters relating to internal college affairs" are not protected).  Or are the administrators like these people for some other reason that reflects an issue of public concern?  A reasonable observer would not know, let alone make the determination, that these comparisons constitute speech about an issue of public concern, like funding issues, admission policies, and accreditation issues.

Without Dr. Seals's post hoc explanation of what the collage was meant to address, a reasonable observer could not conclude whether "the main thrust of the speech in question is essentially public in nature or private," especially given that the speech never left the hallways of the faculty offices at the university. *Alves*, 804 F.3d at 1162 (internal quotation marks and citation omitted).  Lacking that clarity, it cannot be said that the collage "directly" affects the public's perception of the quality

of Auburn's academic system.  *Id.* at 1166 (internal citation omitted).

Since a reasonable juror could not find that the "main thrust" of the collage addressed a matter of public concern, summary judgment is due to be granted on all claims asserting that an adverse action was taken in retaliation for the collage—speech that is not protected.[14]  Finding that the collage did not address a matter of public concern, the Court does not analyze whether it was spoken as a private citizen or as a public employee.

### b.  The Articles

The Defendants do not contest that Dr. Seals's varying involvement and attribution in the different publications constitutes protected speech.  Nor could they; after all, Dr. Seals served as a source (or leak) for each of the articles, providing information about the student-athlete clustering scandal while acting outside the scope of his job duties.

The Defendants do argue that many of the decisionmakers were unaware of Dr. Seals's involvement with these articles—either as a source to the article or from the text of the article itself.  That argument will be appropriately addressed in the following causation analysis.

### 2. Whether Dr. Seals's Interest in Speech Outweighs the

---

[14] In any event, summary judgment is alternatively due to be granted as to the collage claims because it is undisputed that Dr. Seals voluntarily removed the collage seven months before the remaining adverse actions were taken, and there is no other circumstantial evidence that would make up for this large temporal gap to establish causation under the third element of the *Pickering* analysis.  *See Stanley v. City of Dalton*, 219 F.3d 1280, 1291 n.20 (11th Cir. 2000).

### University's Legitimate Interest in Efficient Public Service

Once it has been determined that speech is protected, the Court must next consider "whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service." *Beckwith v. City of Dayton Beach Shores*, 58 F.3d 1554, 1563 (11th Cir. 1995). The Defendants do not advance arguments on this element as to the claims that survive to this point; that is, the articles. Rather, the Defendants argue that Dr. Seals has not established the remaining two elements of his First Amendment retaliation claims—whether the speech substantially motivated the adverse action and whether the adverse action would have happened absent the protected speech. *See Moss*, 782 F.3d at 618. The Court now turns to those elements.

### 3. Whether the Speech was a Substantial Motivating Factor in the Challenged Employment Decisions

The "third stage of the analysis" requires Dr. Seals to show that his protected speech, or perceived protected speech, of providing information about the PUBA-clustering controversy to the press was a substantial motivating factor in the decisionmaker's decision to take an adverse action against Dr. Seals. *See id.*; *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016). This mental state determination is a "question of fact" that "a jury resolves [] unless the evidence is undisputed." *Moss*, 782 F.3d at 618.

At this point, only two adverse actions remain for consideration: (1) Dean Aistrup's removal of Dr. Seals as GPO, and (2) Dr. Kim's decision to give Dr. Seals a "low" annual raise. Dr. Seals has sufficiently established a genuine issue of fact as to whether Dean Aistrup's removal of Dr. Seals as GPO was substantially motivated by Dr. Seals's protected speech. However, Dr. Seals has not made such a showing for his allegedly "low" annual raise, and therefore summary judgment is due to be granted in the Defendants' favor as to that claim.

### a. Removal of Dr. Seals as GPO (May 25, 2018)

The Court first turns to Dr. Seals's allegation that he was removed from his post as GPO because of his protected speech, or perceived speech, in the *Chronicle* article.[15]

As an initial matter, summary judgment is due to be granted on this claim as to all Defendants other than Dean Aistrup. Dr. Seals has failed to rebut their declarations that they were not decisionmakers in the decision to remove Dr. Seals as GPO. That decision was Dean Aistrup's alone. (Doc. 30-3 at 60.) And it has long been established that a non-decisionmaker cannot be held liable for someone else's decision to take an adverse employment action. *See Hartley v. Parnell*, 193

---

[15] Dr. Seals does not clearly allege that he was removed as GPO because of his involvement with the *Wall Street Journal* or the *Gazette* articles. Dr. Seals does, however, allege that the collage motivated his removal, but as discussed above, Dr. Seals's collage does not constitute protected speech, and in any event, there is insufficient evidence to suggest the collage motivated the removal because Dean Aistrup knew about the collage for years and only removed Dr. Seals over seven months *after* Dr. Seals voluntarily removed the collage.

F.3d 1263, 1269 (11th Cir. 1999).

As to him, Dean Aistrup argues that this claim fails because Dr. Seals cannot establish that the *Chronicle* article substantially motivated his decision to remove Dr. Seals as GPO.  (Doc. 31 at 30, 65–66.)  Dr. Seals disputes this, arguing that there is plenty of evidence to submit the question of motivation to a jury.  The Court agrees with Dr. Seals that the evidence in the record creates a genuine dispute of fact as to whether Dr. Seals's protected speech, or perceived speech, in the *Chronicle* article motivated Dean Aistrup's decision to remove him as GPO.

Dean Aistrup's motivation argument boils down to two main points: (1) Dean Aistrup had no knowledge of Dr. Seals's "*Chronicle*-related involvement," meaning he did not have the motive to retaliate against him for his speech; and (2) the temporal proximity between the speech and the adverse employment action is insufficient to create an issue of fact for a jury when he has proffered a legitimate reason for the adverse action.  (Doc. 31 at 66–67.)  Both points are unavailing when viewing the facts in the light most favorable to Dr. Seals.

To begin, lack of knowledge of protected speech means there can be no motive for the retaliatory action because of that speech.  *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) ("To establish a causal connection, a plaintiff must show that the relevant decisionmaker was aware of the protected conduct." (internal quotation and citation omitted)).  Dean Aistrup contends that Dr. Seals has failed to

show that Dean Aistrup knew Dr. Seals's speech was contained in the *Chronicle* article.  The Court disagrees.  Dr. Seals has presented sufficient evidence to show there is a genuine dispute as to whether (1) Dean Aistrup knew Dr. Seals served as a source to the *Chronicle* article, and (2) Dean Aistrup perceived that Dr. Seals's protected speech was in the *Chronicle* article.

While Dr. Seals is not quoted, explicitly mentioned, or given direct attribution in the *Chronicle* article, a reasonable juror could nonetheless conclude that Dean Aistrup knew, or perceived, that Dr. Seals's protected speech was in the article. After all, it is undisputed that Dean Aistrup knew about Dr. Seals's collage, that Dean Aistrup read the *Chronicle* article, and that the article specifically mentioned that members of the economics faculty were feuding with Dean Aistrup over his treatment of the PUBA scandal before describing Dr. Seals's collage:

> Some economics faculty members say that they are convinced that the dean has it in for them, and that the feud has gotten personal.  The antipathy is so strong that no one seemed to blink when a professor put a picture of Aistrup arm in arm with Jacobs, the athletics director, on his office door, alongside photos of Joseph Stalin and Kim Jong-un.

(Doc. 30-1 at 152.)

The Court cannot conclude as a matter of law, as Dean Aistrup suggests, that Dean Aistrup was unaware that Dr. Seals's speech (protected or otherwise) was reflected in the *Chronicle* article when Dean Aistrup read the above-quoted language.  Indeed, the article describes Dr. Seals's collage (which Dean Aistrup had

already seen) with such specificity that there can be no mistaking it as someone else's collage.  Further, a reasonable juror could determine that Dean Aistrup connected the article's statement that "[s]ome economics faculty members say" to Dr. Seals, especially since that statement was followed by a description of Dr. Seals's collage.

Based on the totality of the evidence presented by Dr. Seals, a reasonable juror could conclude that Dean Aistrup, despite his assertions to the contrary, perceived Dr. Seals's speech to have been reflected in the *Chronicle* article's criticisms of the administration's handling of the PUBA-clustering controversy—speech that would be protected.[16]  *See Maples*, 858 F.2d at 1553 ("[T]eachers whose speech directly affects the public's perception of the quality of education in a given academic system find their speech protected."); *see also Heffernan*, 578 U.S. at 273 (holding that if an official punishes an employee for speech protected by the First Amendment, the employee may sue under § 1983, even if the official made a mistake about what the employee said); *DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021) (finding a

---

[16] If a factfinder determines that the only speech Dean Aistrup perceived to be in the *Chronicle* article was related to Dr. Seals's collage, then Dr. Seals's claim would fail because, as discussed, Dr. Seals's collage itself did not constitute protected speech.  However, if the factfinder concludes that Dean Aistrup perceived Dr. Seals's speech to have been reflected in the article's broad criticisms of the administration's handling of the PUBA-controversy, then Dr. Seals's claim would survive this element because this speech is of the type that is protected under the First Amendment. *See, e.g., DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021) (finding that a media leak was protected speech and that if an official retaliated against an employee based on his perception— mistaken or otherwise—that the employee was the leaker, then a viable First Amendment claim exists).

viable First Amendment retaliation claim where an official mistakenly believed an employee leaked protected speech to the media and where the official took adverse actions against the employee because of this mistaken belief).

Because there is an issue of fact as to whether Dean Aistrup knew that Dr. Seals's speech was involved and included in the *Chronicle* article, the next question is whether Dr. Seals has presented enough evidence for a reasonable juror to conclude that this speech was a "substantial" motivating factor in Dean Aistrup's decision to remove Dr. Seals as GPO.  He has.

This causation analysis is one that it typically suited for a jury because it is a determination of the subjective motivation of a decisionmaker.  *See Bryson v. City of Waycross*, 888 F.2d 1562, 1566 n.2 (11th Cir. 1989).  "It is neither possible nor desirable to fashion a single standard for determining when an employee has met [his] initial burden of demonstrating that a retaliatory intent was a 'substantial' or 'motivating factor' behind a government employment decision."  *Beckwith*, 58 F.3d at 1564 (internal citation omitted).  On summary judgment, "[courts] examine the record as a whole to ascertain whether [the plaintiff] presented sufficient evidence for a reasonable jury to conclude that his protected speech was a 'substantial' motivating factor in the decision to terminate him."  *Stanley v. City of Dalton*, 219 F.3d 1280, 1291 (11th Cir. 2000) (citing *Beckwith*, 58 F.3d at 1564).  The Eleventh Circuit has identified several factors for "determining whether protected speech was

41

a 'substantial' motivating factor in an adverse employment decision":

> (1) whether temporal proximity exists between the employment action and the protected activity; (2) whether any reasons for the employment action are pretextual; (3) whether any comments made, or actions taken, by the employer indicate that the employment action was related to the protected speech; (4) whether the asserted reasons for the action vary; and (5) any circumstantial evidence of causation.

*Potter v. City of Miami Gardens*, Case No. 1:14–cv–22624, 2015 WL 11233079, at *5 (S.D. Fla. June 5, 2015) (citing *Stanley*, 219 F.3d at 1291 n.20 (quotation marks omitted)).

Dean Aistrup contends that, other than the proximity between the *Chronicle* article and Dr. Seals's removal, Dr. Seals has not presented *any* evidence to establish motivation. (Doc. 31 at 65–67.) The Court disagrees. Dr. Seals points to several pieces of evidence that tend to show that his removal was substantially motivated by the *Chronicle* article. For example, Dr. Seals provides evidence showing that Dr. Stern, another professor who publicly voiced similar concerns as Dr. Seals and was also involved in the *Chronicle* article, was removed from his role as chair of the Economics Department *on the same day* as Dr. Seals. Dr. Seals has also presented evidence that Dean Aistrup praised Dr. Seals's replacement, Dr. Kim, for dealing with the "nois[y] . . . contingent" within the Economics Department. A juror could reasonably infer from this statement that Dr. Seals's speech in the *Chronicle* article was part and parcel of that "noisy" contingent. Additionally, Dr. Seals points to the fact that Dean Aistrup did not follow official university policy in removing Dr. Seals

as GPO. (Doc. 81 at 29 (citing Doc. 82-10 at 2–5); Doc. 30-3 at 60–61.) And finally, not only was Dean Aistrup's action atypical, but he has shifted from giving no reason at all for the removal to citing Dr. Seals's inflammatory email to President Leath as the rationale.

Of course, a reasonable factfinder could conclude otherwise and find that Dean Aistrup's decision was not substantially motivated by Dr. Seals's protected speech, or Dean Aistrup's perception that Dr. Seals had engaged in protected speech. The jury could also accept Dean Aistrup at his word that he removed Dr. Seals as GPO because of the email Dr. Seals sent President Leath. (Doc. 30-3 at 40.) But this question of mental state is a classic question of fact suited for a jury. *See Bryson*, 888 F.2d at 1566 n.2. In short, the evidence viewed in the light most favorable to Dr. Seals is sufficient to send the question of causation to a jury.

### b. Low Annual Raise

Dr. Seals also alleges that Dr. Kim retaliated against him by awarding him a "low" annual raise, rooted in Dr. Kim's decision to not give him a discretionary market adjustment raise and award him a low score in his annual review based on his research output. However, Dr. Seals does not allege, or present sufficient evidence, that Dr. Kim retaliated against him because of his speech. Indeed, Dr. Seals does not even pinpoint what speech supposedly caused Dr. Kim's alleged retaliation. Rather, Dr. Seals alleges that Dr. Kim gave him a "low" raise because

Dr. Kim was being improperly influenced to do so by Dean Aistrup and Provost Hardgrave.  (Doc. 83 at 71 ("The finder of fact could determine that [Kim's personal raises and promotions were] a payment for Kim's participation in the continued retaliation.").)  Dr. Seals's theory is built from speculative inference, not evidence in the record.  As the Eleventh Circuit has long noted, "inferences based upon speculation are not reasonable." *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986).  After all, "[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotation and citation omitted).  Accordingly, summary judgment is due to be granted in Dr. Kim's favor as to Dr. Seals's claims based on his annual raise.

### 4.  Whether the Same Employment Decisions Would Have Been Made in the Absence of Dr. Seals's Protected Speech

The last element in a public employment First Amendment retaliation claim asks "whether the government would have made the same employment decision in the absence of protected conduct." *Beckwith*, 58 F.3d at 1563–64.  Like with the first causation prong, this determination is a question of fact that a jury resolves unless the evidence is undisputed.  *Moss*, 782 F.3d at 618.

The only claim that has made it this far is Dr. Seals's allegation that Dean Aistrup removed him as GPO because of his involvement, or perceived involvement,

with the February 18, 2018 *Chronicle* article.  Accordingly, it is Dean Aistrup's burden to demonstrate that there is no genuine dispute of material fact that he would have removed Dr. Seals in the absence of the *Chronicle* article.  *See Beckwith*, 58 F.3d at 1564.

Dean Aistrup argues that he would have removed Dr. Seals absent the article because he had a legitimate reason to do so.  Namely, Dean Aistrup points to Dr. Seals's March 22, 2018 email to President Leath as the real, and legitimate, reason for his action.  (Doc. 31 at 70–73.)  Dean Aistrup has testified that the email showed a dereliction of duty to the department that merited and led to Dr. Seals's removal as GPO.  (Doc. 30-3 at 43.)  But Dean Aistrup provided no such explanation to Dr. Seals at the time of his removal.  Indeed, no internal documentation in the record supports this reasoning either.  Based on Dean Aistrup's post hoc justification, a reasonable factfinder could conclude that the explanation is mere pretext for the real reason: Dean Aistrup believed Dr. Seals had leaked information critical of the administration's handling of a public matter to the media.  *See Grandison v. Ala. State Univ.*, No. 2:20-CV-483-WKW, 2022 WL 418689, at *7 (M.D. Ala. Feb. 10, 2022) ("Evidence of a post-hoc attempt to justify an employment decision may be evidence of pretext.") (quoting *Keaton v. Cobb Cnty.*, 545 F. Supp. 2d 1275, 1303 (N.D. Ga. 2008), *aff'd*, No. 08-11220, 2009 WL 212097 (11th Cir. Jan. 30, 2009)).  And again, Dr. Seals's removal as GPO coincided to the same day with his co-critic's

(Dr. Stern) removal as Chair, which weighs against a finding as a matter of law that Dr. Seals's removal would not have occurred absent the *Chronicle* article.  *See Stanley*, 219 F.3d at 1291 n.20.

Accordingly, Dean Aistrup's explanation is insufficient to place the question of whether he would have removed Dr. Seals absent the *Chronicle* article beyond genuine dispute.  Having established genuine issues of material fact as to all elements of a First Amendment public employment retaliation claim, Dean Aistrup's summary judgment motion is due to be denied to the extent Dr. Seals alleges that Dean Aistrup removed him from his post as GPO because of his speech, or perceived speech, in the *Chronicle* article.

### C. Qualified Immunity

Finally, while the Defendants assert the doctrine of qualified immunity as to many, but not all, claims, Dean Aistrup does not assert qualified immunity as to the only surviving claim: Dr. Seals's removal as GPO.  Therefore, the Court does not consider the issue of qualified immunity in this matter.

### V. CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1)   The Defendants' Motion for Summary Judgment (Doc. 29) is **GRANTED** in part and **DENIED** in part.  It is DENIED as to Plaintiff Alan Seals's § 1983 First Amendment retaliation claim against Joseph Aistrup in his individual

and official capacities concerning the removal of Seals as the graduate program officer related to the *Chronicle* article.  It is GRANTED in all other respects.

(2)   Defendants Steven Leath, William Hardgrave, Timothy R. Boosinger, and Hyeongwoo Kim (in both their individual and official capacities) are **DISMISSED** as Defendants.

DONE on this the 3rd day of November, 2022.

> _____/s/ R. Austin Huffaker, Jr.____
> R. AUSTIN HUFFAKER, JR.
> UNITED STATES DISTRICT JUDGE

47

# APPENDIX

